By the Court.—Sedgwick, J.
We are confined to an examination of the legal character of the exceptions taken on the trial.
*528 There can be no doubt that the plaintiffs agreed to furnish the place, the settings and the foundation, where and on which the contractors were to erect the machinery. This agreement they were bound to perform, under the ordinary rules of law that relate to contracts. These had to be furnished before the contractors could perform their part of the contract (Young v. Hunter, N. Y. R. p. 206-7; Stewart v. Keteltas, 36 N. Y R. p. 390; Allamon v. Mayor, etc., of Albany, 43 Barb. p. 33; Goodwin v. Holbrook, 4 Wend. 377). As the settings, foundations, etc., would be built for the purposes of engines and machinery, the plaintiffs might perhaps require some previous information as to the weight, size, and shape of the engines, etc. It is conceivable that a party situated as the plaintiffs were might choose to take the risk of performing his part of the contract, so that it would be fit to bear the machinery and endure with safety its working, whatever its size, shape, or weight might turn out to be. Ordinarily, however, the preparation would be made so as to conform to the machinery as it was designed to be. In such case a question might arise in the construction of such a contract as to whether the plaintiffs were bound to ask from the contractors the necessary information as to the proposed character of the engines, or whether, as the character of the engines, within certain very general limits, was to be within the discretion of the contractors, they would be bound to give information of it (without request) to the contractors (Note to Lent v. Padelford, 2 Am. Leading Cases, 5th ed. p. 65). In this particular case the contract was drawn, as if plans of the proposed work had been made and certified by the contractors and plaintiffs’ engineers. These would have given what was necessary to be known for the erection of a suitable building. This perhaps involved an understanding that the contractors were without special request to give the required information, when, *529 ns happened in this case, the plans were not made or at least certified to, and in the keeping of the plaintiffs’ engineers. Whatever question might arise on this subject, it would only refer, at the best for the plaintiffs, to their obtaining, in the proper way, necessary information to enable them to perform their part of the contract. Beyond that they were held to the performance of their part of the contract without assistance from the •contractors. This question was not raised upon any exception taken on the trial. As the evidence stood, it might have been of no practical use to the plaintiffs to make a specific issue as to it. There was a great •deal of testimony to show that the plaintiffs’ engineer and the contractors had frequent and full inter-change of views and designs as to the work each party proposed to do, and the mode of its accomplishment. If the plaintiffs had required a submission to •the jury as to whether, before the erection of the building, the contractors had truly conveyed enough information to the plaintiffs’ engineer to enable them to furnish =a proper building, it is impossible to say that the jury would have been bound to find for the plaintiffs.
So much has been said for the purpose of considering a request to charge made by the plaintiffs, which was refused by the court. It was “ that the alleged defects in the construction or bracing of the building constituted no default on plaintiffs’ part, unless the contractors notified the plaintiffs of such defects as being calculated to prevent the successful working of the machinery.” This the court properly refused to charge. If we suppose that (as to which we have seen the plaintiffs made no question) their engineer knew what the engines were meant to be by the contractors, or if we suppose even that the contractors, being bound to give information .as to the engines, failed so to do, the contractors were not at all bound to inspect the building as it was being -constructed, or the plans for the same, and to point out *530 defects in either as being calculated to prevent the successful working of the machinery. The plaintiffs were bound so to perform without reliance on the contractors that there should not be such defects. As we have before intimated, this is a different duty from giving necessary information as to the character of the proposed engines. And it is a different duty from that of not misleading the plaintiffs’ engineer in an unlawful manner, so as to make something in the nature of an estoppel against the contractor, in favor of the plaintiffs. Even if the engineer sought the opinion of the contractors, at the request of the latter, if the latter gave it honestly, but as an opinion, the plaintiffs were not excused if their engineer, following that opinion, failed to make the proper structure. The testimony in the case does not exhibit anything which might, in reference to this request, be claimed to be an acquiescence of the contractors in the peculiar construction of the building, or an acceptance of the building, as fulfilling the contract, or a waiver of any other kind of performance in this regard. A controlling consideration in respect of this is, that when the plaintiffs’ engineer proposed to substitute iron columns for stone walls, under certain parts of the engine, one of the contractors, in response to the proposal, sent to the engineer a rough sketch of the building, with buttresses drafted in it as supports of the side walls. The alleged weakness of the building was due to the iron columns being placed there, and the contractors’ sketch put in the buttresses as a compensation for that weakness in their keeping firm and steady those side walls. So long as the contractors did not disaffirm the natural inference from such a sketch, it cannot be said that they suffered or acquiesced in the construction of a building that should have the iron columns, and yet be without the special strength derived from the buttresses, or some equivalent support.
*531 It is said, however, that the letter containing this sketch, and the sketch itself, were sent some time before the execution and delivery of the contract, and cannot affect the contract afterwards made. It could not of course modify or vary that contract. It was, however, competent evidence to show the knowledge and information possessed by each party, after the contract was completed. This makes its only importance on this point.
I conclude, therefore, that the request involved an affirmance as a rule of law, that the contractors should notify the plaintiffs of the existence of defects, which the plaintiffs had covenanted should not exist, and that the court was right in refusing to charge it.
I think the request as made refers to the building after it was constructed and offered in performance for the erection of the machinery. In such case, it was-to be judged of, just as it then stood, and the contractors could not be bound to notify of any defects, inasmuch as the engineer of the plaintiffs was as capable of estimating its qualities as were the contractors. It is not entirely clear that such was the intended meaning of the request, because it was followed by a request now to be stated.
The plaintiffs further requested the court to charge,' “that any suggestions on this subject to the plaintiffs’ “ engineer, prior to the execution of the contract, did “not operate as such a notification, and must be disregarded by the jury.” I take this to have implied that if what was suggested before the contract would have operated as a notification on the subject if it had been given after, it was insufficient because not given after. This does not seem to be correct. The act of notification in such circumstances is only so to inform the mind of the person to be notified, that he may, intelligently and with understanding of the exigencies of the situation, do what he is called upon to do. It is *532 therefore not necessary that he should .gain that information at any particular point of time, provided that he is possessed of it when he is called upon to act, in reference to that which in the first place was pointed out to him.
On this subject it is worth while to see how far the United States Courts have gone. In the case of The Distilled Spirits, 11 Wall, p. 356, Judge Bradley, delivering the opinion of the Supreme Court, said, “that “in England the doctrine seems to be established, that “if the agent, at the time of effecting a purchase, has “knowledge of any prior lien, trust or fraud affecting “the property, no matter whén he acquired such ‘6 knowledge, his principal is affected thereby. If he ac- ■“ quire the knowledge when he effects the purchase, no “ question can arise as to his having it, at that time ; if “ he acquired it previous to the purchase, the presump“tion that he still retains it, and has it present in his “mind, will depend on the lapse of time and other cir- “ cumstances. Knowledge communicated to the principal himself he is bound to recollect, but he is not “bound by knowledge communicated to his agent, “ unless it is present to the agent’s mind at the time of “effecting the purchase. Clear and satisfactory proof “that it was so present, seems to be the only restriction ‘£ required by the English rule as now understood. With “the qualification, that the agent is at liberty to com“municate his knowledge to his principal, it appears to “us to be a sound view of the subject.” I therefore think it would have been error to have charged that the suggestion, if given before the making of the contract, ■could not for that reason have operated as a notification .after the contract was made.
The contractors were not bound to prescribe a plan ■or method of the building. They could not be bound to explicitly require that a plan that they were not bound to make should be carried out. The request to *533 charge that any suggestions during the progress of the work did not operate as a notification, unless they amounted to an explicit requirement that the building should be constructed or braced according to some plan or method prescribed by the contractors, was erroneous, and the court should not have charged it.
The plaintiff took exception to a part of the court’s charge in these words : “I do not think it material in “this case whether Dickerson and Sickels, after that “ suggestion of the column work, made any further suggestion as to the bracing of the walls, or whether they “made any complaints about their not being braced or “the bracing not being sufficient, except so far as these “matters tend to affect the credibility of the witnesses “upon that question.” The suggestion here referred to was the sketch which we have already noticed, and which contained buttresses, as a means of strengthening the side walls. There does not seem to be any doubt that this was an assertion by the contractors to the plaintiffs’ engineers, that in ca,se the iron columns were used, then special means should be used, to strengthen the side walls. The court was right in saying that it was not material whether other suggestions of the same kind were made. If made once, they were not bound to repeat, any more than in case of a repetition they would be bound to state them a third time.
There were other exceptions taken to the charge, which cannot be deemed valid, because they were general in their scope, and were applied to parts of the charge, containing several propositions, some of which were, in each instance of these exceptions, correct (Ayrault v. The Pacific Bank, 47 N. Y. R. p. 576). In such case, if we suppose the charge to be in part incorrect, the exception is likewise so, and cannot be sustained. But in the charge, or the parts here referred to, there was no misdirection of the jury in relation to the questions which were submitted to them..
*534 The court instructed the jury in substance, that they should find for the plaintiff, unless they should come to the conclusion that the failure of the engine and machinery to accomplish the work or service contemplated by the agreement, was solely due to the walls of the building, provided by the plaintiffs, not being sufficiently firm and rigid. This was plainly beneficial to the plaintiff, so far as it took from the jury the other defences set up in the answer.
A great deal of testimony was given, under objection and exception by the plaintiffs, as to interviews, and arrangements between the contractors and the plaintiffs’ engineer concerning boilers, before the contract was made. The defendants sought to prove, by this testimony, that the'boilers were made at Detroit, at the request of plaintiffs’ engineer ; the latter assuming, in behalf of the plaintiffs, to guarantee that the boilers, when made, would satisfy the terms of the agreement in respect of them. It can hardly be debated, that it was within the scope (really or apparently) of the engineer’s authority as an agent for the purpose of attending to the execution of the contract in plaintiff’s behalf, to subvert an important part of the contract by such an arrangement. The evidence tending to show that was not admissible for such purpose. That it was admissible for any purpose does not clearly appear (Riley V; The City of Brooklyn, 47 N. Y. R. p. 446). The court, however, afterwards withdrew from the jury the issue made by the answer, in respect of the boilers, in effect determining it in. the plaintiffs’ favor. The admission of the testimony in regard to the boilers, had no bearing upon the issue of fact presented to the jury, as to whether the sole cause of the failure of the engines was the deficiency of the building. It could not have harmed the plaintiffs unless it tended to confuse the minds of the jury in passing on the issue as to the building, or unless it affected the credibility of some *535 witness. Irrelevant or immaterial testimony might affect the mind of a juror, if it had a false semblance of competent testimony, or if the case were such that it appeared he was led to think it to be his duty to consider the immaterial or irrelevant testimony in reaching a verdict. But the testimony now referred to had no relation to the building, The two matters were disconnected, and no testimony was given that tended to connect them. The jury must be supposed to have known that when the controversy respecting the boilers was determined by the court in plaintiffs’ favor, that the testimony given in regard to that, had no longer any significance in the action.
Bor was the credibility of any witness affected by the testimony. It did not contradict any of plaintiffs’ witnesses. In fact, Mr. Houghton, the plaintiffs’ engineer was not examined as to interviews about the boilers before the making of the contract. The letter written by him, especially that of June 24, 1856, put in evidence by the plaintiffs, did not make a question as to the credibility of Mr. Houghton as a witness.
If these matters, so put in evidence, had been an impeachment of Mr. Houghton’s integrity, they might have improperly injured him with the jury. His good faith and honesty were not involved in those transactions. At most, it appeared he exceeded his power as plaintiffs’ agent, but not with an evil mind or a dishonest purpose.
Inasmuch as we can see that the testimony alluded to did not affect the verdict of the jury, its admission does mot call for a reversal (Rundle v. Allison, 34 N. Y. R. p. 183; Erben v. Lorillard, 19 N. Y. R. p. 302; 57 .Barb. p. 99).
The admission of Mr. Houghton’s declaration (at the time he procured the defendants’ consent to the extension of the time for the performance of the contract), *536 that the plaintiff guaranteed the boilers, we think was admissable. If not, it did not injure the plaintiffs.
The specifications contained a provision that, during the construction and erection of the engine, the engineer of the plaintiffs’ was to have access at all times to the' work, and to have power to reject inferior work, and to cause good work to be substituted, and to condemn any material going into the machinery which should not be of the best quality. This made admissible all the testimony that was given of the engineer’s interviews, letters and statements in respect of the work,, which took place or were made after the contract.
The evidence given by experts on behalf of defendants as to the capacity of the engines, had a definite bearing upon the inquiry, whether the engines failed, because of the character of the building furnished by the plaintiffs. It was the proper basis of an argument, that the proof showed that everything was right so far as the engines themselves were concerned, and the failure could only be explained by relying on the testimony that the building was not suitable.
On the whole, it does not clearly appear that, there was any error in the rulings and charge excepted to, and judgment should be ordered for defendants on the verdict, with costs.